IN THE DISTRICT COURT OF TEXAS COUNTY, OKLAHOMA

Norma Jeanne Brumley Murrah, on behalf of )
herself and as trustee for the Jeanne )
Brumley Revocable Trust, )
and all others similarly situated, )
)
           Plaintiff, )
)
v. )
)
EOG Resources, Inc. (including predecessors )
and successors), )
)
           Defendant. )
)

Case No. CJ-2010-60

**TEXAS COUNTY**
**F I L E D**

AUG 2 0 2010

**KAREN PARISH**
**COURT CLERK**
By_____ Deputy

## CLASS ACTION PETITION

    Plaintiff brings this claim on behalf of herself and the Class of all other persons similarly situated against Defendant, and in support of these claims states as follows:

### NATURE OF THE ACTION

1.    Plaintiff and the Class bring claims based upon Defendant's underpayment or non-payment of royalties on natural gas and/or constituents of the gas stream produced from wells in Oklahoma through improper accounting methods (such as starting with a price that is too low and then taking improper deductions) and by failing to account for and pay royalties, all as more fully described below.

### VENUE AND JURISDICTION

2.    Norma Jeanne Brumley Murrah is a citizen and resident of Texas County, Oklahoma, and trustee of the Jeanne Brumley Revocable Trust dated March 29, 2006 (together, "Plaintiff").

3.    This Court has jurisdiction over Defendant in that its wrongful acts occurred and caused damages to Class members in this County.

4.    Venue is proper in this Court for one or more of the following reasons: (i) many of the

**EXHIBIT**

**1**

wells and royalties therefrom are located in this County; (ii) Class members reside in this County; and (iii) Defendant does substantial continuous business in this County.

**PARTIES**

5.      Plaintiff has a royalty interests in the Bryan Farms 24 #1, Thelma 24 #1, Mussman C 28 #1, Janice 27 #1, Armour B 2 #1, Janice 27 #2, and Mussman C 28 #6, all located in Texas County, Oklahoma.  Defendant owns a working interest in and pays royalty to Plaintiff on each of these wells.

6.      Defendant EOG Resources, Inc. (including predecessors such as Enron Oil & Gas Company and EOG (Oklahoma) Inc, affiliates such as EOG Resources Marketing, Inc., and successors, collectively "EOG") is believed to be a Delaware corporation with its headquarters in Houston Texas and is doing business in Texas County, Oklahoma.  EOG can be served by serving The Corporation Company, 1833 S. Morgan Rd., Oklahoma City, OK 73128.

7.      Defendant is in the business of producing and marketing gas and constituent products from the wells in which Class members hold royalty interests.

8.      The usual royalty payment is between $1/8^{th}$ and $3/16^{th}$ of a well's revenue.

9.      Defendant and its predecessors, successors, and current and past employees, agents, representatives, attorneys, or others acting on its behalf and all those to whose prior leasehold interests it has succeeded and for whom they are legally liable whether by merger, assignment, or otherwise shall herein collectively be known as "Defendant" or "EOG".

10.     The acts charged in this Petition as having been done by Defendant were authorized, ordered, or done by officers, agents, affiliates, employees, or representatives, while actively engaged in the conduct or management of Defendant's business or affairs, and within the scope of their employment or agency with Defendant.

2

## CLASS ACTION ALLEGATIONS

11.     Plaintiff brings this action individually and, pursuant to 12 O.S § 2023 (A) and (B)(3), as

representative of a class defined as follows:

> All royalty owners of EOG Resources, Inc. (or its predecessors and successors)
> from Oklahoma wells that have produced gas and/or gas constituents (such as
> residue gas, natural gas liquids, helium, nitrogen, or condensate) from January 1,
> 1987 to the present.

> Excluded from the Class are: (1) the Mineral Management Service (Indian tribes
> and the United States); (2) Defendant, its affiliates, predecessors, and employees,
> officers and directors; and (3) Any NYSE or NASDAQ listed company (and its
> subsidiaries) engaged in oil and gas exploration, gathering, processing, or
> marketing.

12.     The members of the Class are so numerous and geographically dispersed that

joinder of all members is impracticable.  For instance, Defendant has operated over 800

wells producing gas in Oklahoma and many more in which it holds a working interest,

with at least one, and usually more, royalty owners for each well.  While many royalty

owners remain in Oklahoma, many others reside in numerous other states, and perhaps

countries. Defendant has within its possession or control records that identify all persons

to whom it (including predecessors and those for whom it is legally responsible) has paid

royalties from wells located within Oklahoma from January 1, 1987 to present.

13.     The questions of fact or law common to Plaintiff and the class include, without

limitation, one or more of the following:

> (a)     Whether Plaintiff and the Class members are the beneficiaries of an
> implied covenant obligating Defendant to place the gas (and its constituents) from
> Class Wells into Marketable Condition;

> (b)     Whether Defendant is solely responsible for all costs necessary to render
> commercially marketable the gas and constituent parts produced under the oil and
> gas leases:

> (c)     Determining the point at which the gas (and its constituents) that Defendant
> produces becomes commercially marketable;

(i) Whether Marketable Condition for residue gas occurs at transmission pipeline quality as Plaintiff contends or earlier;
(ii) Whether Marketable Condition for NGLs occurs at fractionation quality as Plaintiff contends or earlier; and
(iii) Whether Marketable Condition for helium occurs at Grade A quality as Plaintiff contends or earlier;

(d)    Whether Defendant deducted (in cash or in kind) amounts for placing the gas (and its constituents) into Marketable Condition before paying royalty to Plaintiff and the Class members;

(e)    Whether Defendant (including any of its affiliates) paid royalty to Plaintiff and the Class members based on a starting price below what Defendant or its affiliates received in arm's-length sales transactions;

(f)    Whether Defendant paid royalty to Plaintiff and the Class members for all gas constituents, such as condensate, nitrogen, and helium, produced from their wells.

(g)    Whether Defendant calculated the royalty paid to Plaintiff and the Class according to the internal accounting, royalty payment formulas, and record-keeping operations of Defendant which are not known to or knowable by the members of the Class;

(h)    Whether the check stubs Defendant used in paying royalty to Plaintiff and the Class members misrepresented or fraudulently concealed, by omission, commission or both, the true facts about Defendant's calculation of royalty owed;

(i)    Whether Defendant's payment of royalty to Plaintiff and the Class members on a monthly basis is an open account;

(j)    Whether Plaintiff and the Class members have the same legal claims to recover the above-described underpayments;

(k)    Whether Defendant's uniform practice of paying royalties under the oil and gas leases based upon the selling price of raw gas to third parties that gather, process, and deliver the gas to the commercial market place as opposed to the amounts received from the sale of the residue gas and other constituents in the commercial market place constitute a breach of Defendant's lease obligations to Plaintiff and the Class members.

14.    Plaintiff is typical of other class members because Defendant pays royalty to Plaintiff and other class members using a common method. EOG pays royalty based on the net revenue EOG receives under its marketing contracts. The marketing contract terms are unknown to and unapproved by royalty owners. The contracts are necessary to place the gas and its constituent parts into marketable condition. Plaintiff and the class members are also typical because their

leases do not contain an express provision authorizing deductions of all of the gas conditioning costs to make the gas into marketable condition.

15.    Plaintiff will fairly and adequately protect the interests of the members of the Class, and has previously been found to be an adequate class representative in similar class litigation. Plaintiff is a royalty owner paid by Defendant, and understands its duties as a Class representative. Plaintiff has retained counsel competent and experienced in class action and royalty owner litigation.

16.    This action is properly maintainable as a class action. Common questions of law *or* fact exist as to all members of the Class and those common questions predominate over any questions solely affecting individual members of such Class. *See* ¶ 13 above. There is no need for individual Class members to testify in order to establish Defendant's liability or even damages to the Class.

17.    Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the Class. Class action treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts and/or Defendant. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class members.

18.    Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by the members of the Class because joinder of all members of those Class

would be either highly impracticable or impossible and because the amounts at stake for individual Class members, while significant in the aggregate, are not great enough to enable them to enlist the assistance of competent legal counsel to pursue their claims individually. In the absence of a class action in this matter, Defendant will likely retain the benefit of its wrongdoing.

## GAS INDUSTRY BACKGROUND

19.      The members of the Plaintiff Class own interests in wells that produce gas and constituent products that are subject to uniform accounting methods and to applicable implied marketable product law which requires the lessee to bear all of the costs of placing the products, whether gas or its constituent parts, in "Marketable Condition".

20.      The lessee under an oil and gas lease has the duty to produce marketable products, and the lessee alone bears the expense in making all products marketable. Gas and its constituent parts are marketable only when in the physical condition to be bought and sold in a commercial marketplace.

21.      Only after a given product is marketable does a royalty owner have to pay its proportionate share of the reasonable costs to get a higher enhanced value or price for that particular product.

### The Lessor-Lessee Relationship

22.      The lessor owns minerals, including oil and gas, and the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee enter into a lease that allows the lessee to take the minerals from the lessor's land. The usual revenue split from a well was 1/8th to the lessor (royalty owner) and 7/8ths to the lessee. As the risk of finding oil and gas has diminished over time, due to the prevalence of wells delineating the field, better

6

seismic technology to find oil and gas, and drilling rigs becoming more efficient, royalty owners on more recent leases have received 3/16th or even 1/4th of the revenue  The oil and gas companies through undisclosed internal accounting practices have tried to keep as much of the well revenue as possible.  These accounting practices are at the heart of every oil and gas royalty owner case.

23.     Rather than adopting transparency in its royalty calculation formula, Defendant, like most lessees, has guarded its production and accounting processes as confidential or proprietary, thereby, depriving the royalty owners of critical information.  Consequently, the royalty owner is unaware of the lessee's actual practices which enables the lessee to breach the oil and gas lease without accountability.  Amazingly, these one-sided, half-century long deals can never (as a practical matter) be breached by the royalty owner.  So the lessee can breach, and if caught, can force a settlement for a only percentage of what it should have paid in royalty or zero, thus making the breach profitable.

24.     If after years one or more of the royalty owners learn of the "breach", the royalty owner has only 3—all poor—options: (1) confront the lessee and maybe get paid while the lessee continues to retain improperly garnered gas revenues from thousands of other unknowing royalty owners; (2) do nothing since it only results in a modest yearly loss to them and individual litigation is too expensive to pursue for that; or (3) file a class action lawsuit which will last for years and probably will not recover the full loss.  In short, if lessee breaches, it may never be held accountable, and if a royalty owner complains, the lessee will still come out ahead because an individual case is not worth much and a class action rarely requires 100% repayment to royalty owners plus pre-judgment interest, plus attorneys' fees and expenses.  The class action is the best of the options, hence this suit.

7

### Residue Gas, Helium, Nitrogen and Natural Gas Liquids Production

25.     The gas is gathered from each well, dehydrated and compressed, through gathering lines that are buried underground and cross many miles of land.  The three primary well gas products-- methane, natural gas liquids ("NGLs"), and helium--are further processed at processing plants before being trucked or piped to the commercial market and on to the end-user.

### Wellhead (Basic Separation and Gas Measurement)

26.     The diagram below illustrates the gas conditioning process.



Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen, etc, all mixed together in the gas stream.[1]  After the stream comes out of the ground, it enters the free

---

[1]     Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from a pure gaseous state to liquid condensate).  The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon

water knockout (a/k/a three-phase separator) which separates the products by gravity, water at the bottom, oil in the middle, and gas going out the top. Due to the low technology, the separator is not expensive (the "separation cost"). The gaseous mixture (with helium, nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[2] The remaining fluid goes through the heater-treater where heat, gravity segregation, chemical additives and electric current break down the mixture more clearly into oil and water. The heater-treater is installed, maintained and takes fuel to operate (the "heater-treater cost"). The water is drained off and sent for salt water disposal. The oil that is separated at the wellhead is collected in a tank, usually trucked out and sold. [The payment of oil royalties is not at issue in this lawsuit.]

27.     Since the pressure of many wells has depleted over the decades of production, sometimes wellhead compressors have been installed to suction gas out of the well or just to move the gaseous mixture. These wellhead compressors are installed, maintained and use fuel (the "wellhead compression" or "vacuum compression" cost). The gaseous mixture produced from a single well cannot be processed economically, so the mixtures are 'gathered' together through gathering lines and the aggregate mixture is put through a processing plant. *See* http://www.kgs.ku.edu/Publications/Oil/primer13.html

---

dioxide and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas".

2       A minute portion of this raw or mixed gaseous product may be used on the leased land to heat the farm house pursuant to a free gas clause in the lease or sometimes sold to a small, limited local market with a finite demand to local irrigators near the wellhead. This limited local market accounts for less than 5% of a producer's gas production.



### Gathering Lines (Dehydration, Compression, Condensate)

28.    As the gaseous mixture from each well enters the gathering line it is measured, both

volume (in Mcf) and in quality (Btu content) (combined, "gas measurement" done in MMBtu).

This is done in a meter run which must be constantly maintained to preserve accuracy (the

"measurement cost"). Gathering pipelines are made of metal that could be corroded by any

remaining water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator

is used to remove the water vapor ("dehydrator cost"). Of course, gas cannot move unless it is

pressurized, so large gas compressors are installed to move the gas down the gathering line. The

gas must be pressurized high enough to overcome the back-pressure in the line and friction.

These compressors are expensive and require fuel to operate (together, "gathering or field

compression fee" and/or "gathering fuel"). The gathering pipelines themselves cost money to

lay and maintain ("gathering cost"). Gas condensate (gas condensed into liquid as it cools) is

collected at points along the gathering lines as a result of cleaning or "pigging the line"

("Condensate"), and is captured for fractionation later. Finally, gathering lines leak, especially

as they age, resulting in lost and unaccounted for gas ("L&U").

## Natural Gas Processing

29.    Once the gas mixture is gathered from a sufficient number of wells (and often from multiple gathering systems), it enters the inlet of the processing plant. To process the gas into methane, crude helium, and mixed NGLs, lessees, such as Defendant, use gas processing plants. Sometimes the processing plant is owned by an unrelated third party and sometimes it is owned in whole or in part by lessees. Sometimes other impurities in the mixture must be removed such as carbon dioxide, nitrogen, or sulfur (the "treatment cost"). Methane gas (sometimes called "residue gas") must meet the quality standards for long-haul pipeline transmission set by the Federal Energy Regulatory Commission (FERC) which is called "pipeline quality gas". NGLs are used as a feedstock in the petrochemical and oil refining industries, and are worth more than methane. NGLs are separated from the gaseous mixture by cooling the mixture until the NGLs become separated. This cooling or Cryogenic recovery method usually takes place at temperatures lower than minus 150°F (the "Cryogenic or cooling process"). The mixture of NGLs is further moved down a liquids pipeline and processed by a fractionator for separation of the NGLs into their component parts ("T&F" or "fractionation"). Helium is processed into a crude mixture known as "raw helium" or "crude helium". Raw helium contains impurities and must be further processed into Grade A helium for commercial sale and use. This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel").

30.    At the tailgate of the processing plant, at least four products emerge: (1) crude helium; (2) residue gas (or methane gas); (3) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade); and (4) nitrogen and other products. None are commercially marketable at that point.

11

## Marketable Condition for the Products

31.  *Helium.* Crude helium (about 50%-80% pure) has little commercial use; instead, it has to be further processed into Grade-A helium (99.9% pure). http://minerals.usgs.gov/minerals/pubs/commodity/helium/heliumcs05.pdf The crude helium from the processing plant is then piped to one of the Grade A helium processing plants.

32.  Helium is an element. Helium has no Btu content, and will not burn. Helium is found in the natural gas stream but is not itself natural gas. Helium is an increasingly valuable product. http://www.jbs.cam.ac.uk/programmes/phd/downloads/conference_spring2007/papers/cai.pdf ("Eventually we expect helium prices to be sufficient to motivate gas extraction from wells where the helium is the primary product and other gases, such as natural gas and carbon dioxide, would form a by-product."). The gas streams from Plaintiff's wells and those of other Class members contain helium. Helium is extracted at the processing plants, but Defendant does not pay royalty at all, or not completely, on the helium from Plaintiff's and Class members' wells.

33.  *Methane Gas.* Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor (the "booster compression" cost).

34.  *NGLs.* The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products—ethane, propane, butane, isobutane, natural gasoline, etc. *See,* http://ngl.conocophillips.com/news/about.htm. Defendant improperly deducts, in computing royalty for NGLs, processing fees and/or other costs (such as transportation and fractionation, T&F) needed to reach commercially marketable fractionated NGLs. Such deductions are improper.

35.    *Nitrogen and other Products.*  Nitrogen is produced and processed without payment of royalty, and Plaintiff and Class members are entitled to royalty on nitrogen produced from their wells and used or sold.  The same is true of other products, such as Condensate which falls out from cooling on the gathering line.

## Sale of Products

36.    To turn the gas products into money, the producer then sells the products.  One would expect that such sales would occur in the commercial market place in an arm's length transactions.  That, in fact, occurs, but lessees attempt to cover up and manipulate that fact by self-serving language in marketing contracts about title transfers or even by creating wholly owned affiliates to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

37.    The "starting price" for gas products is most often established by the lessee through a "weighted average sales price" or an "index price".  If Defendant has the market power to, over time, obtain above "index price" in its arm's length sales, then as an agent for the royalty owner, the royalty owner is entitled to this higher price over time as well.

a.    *Affiliated Service Companies May Be Used Before The Products Are Placed In Marketable Condition.*

38.    Some lessees contract with affiliated gathering companies or other affiliated gas service providers before the products (residue gas and/or NGLs) are in Marketable Condition in an effort to: (1) artificially, and improperly, create a commercial market where none truly exists in order to justify deducting costs from, or not even paying for, the gas or constituent products to royalty owners; (2) charge "marketing fees" to royalty owners through affiliates even though the lessee is already obligated under the lease to market the gas and constituent products; and/or (3) pay on the lower lessee/affiliate sale price not the higher affiliate/third party price.

b.   *Affiliated Marketing Companies May Be Used After Products Are Placed in Marketable Condition.*

39.   The "weighted average sales price" involves a pool of sales transactions to third parties (and/or affiliates) and combines the prices paid by those third parties (and/or affiliates) to arrive at a "weighted average sales price". Lessees can manipulate this process by using lower lessee/affiliate sales prices for part of the pool price, rather than all third party arm's length sale prices.

## Different Ways Defendant Underpays Royalty Owners

40.   The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-lessee relationship are constant temptations to lessees to wrongfully retain gas revenues. All payment formulas, affiliate and non-affiliate contractual relationships, and all calculations are exclusively in the control of lessees, *and* they involve undisclosed accounting and operational practices. As a result, there are many ways royalty owners are underpaid on their royalty interests, and they never know it. The common thread through all of these schemes is that they are typically buried in the internal lessee accounting systems or royalty-payment formulas.

41.   Defendant represents the royalty calculation on the form of a monthly check stub it sends each royalty owner. The check stub shows each royalty owner's interest (which is not in dispute here), and volume, price, deductions, value, and taxes, all of which are disputed.

42.   Defendant underpays Plaintiff and the Class in one or more of the following ways, without limitation:

(a)   Helium. Helium is contained in the well-stream produced from Plaintiff's and most Class members' wells, but Defendant: (i) fails to pay royalty for all of the helium produced (some is lost and unaccounted for in the gathering process); (ii) deducts processing fees and costs even

though the helium is not yet in commercial grade; (iii) pays at a lower than commercial Grade A price; and (iv) deducts a helium severance tax that is not owed.

(b)   Condensate.  Plaintiff's and Class members' wells produce heavy hydrocarbons that condense in the pipeline and are recovered by Defendant (or on behalf of Defendant by its gatherers), but Defendant fails to pay *any* royalty for that Condensate. Some of this failure to pay may be accomplished by use of an affiliate such as EOG Resources Marketing, Inc.

(c)   Natural Gas Liquids (NGLs).  Defendant: ( i) fails to pay royalty for all of the NGLs produced (some is lost and unaccounted for in the gathering process); (ii) deducts processing fees and expenses; iii) and reduces payment by T&F all before obtaining commercially marketable fractionated NGLs.  NGLs should be paid on a fully fractionated basis and only on arm's length sales. Some of this failure to pay may be accomplished by use of an affiliate such as EOG Resources Marketing, Inc.

(d)   Residue Gas.

(i)   The starting price paid for residue gas may be improper as affiliate sales to  an affiliate such as EOG Resources Marketing, Inc., which owns gathering lines in Oklahoma, instead of an arm's length, third party sale price;

(ii)   The volume paid to royalty owners and reflected on their check stubs is less than is the volume actually produced from the wells because, among other things, Defendant improperly deducts in-kind gas used in gathering and processing, and lost gas in the gathering line;

(iii)   Deducting (in cash or in-kind) costs for placing the gas in Marketable Condition, such as gathering, treating/conditioning, dehydration, compression, processing, or other deductions is improper;

(e)   Nitrogen and Other Products.  Defendant fails to account and pay royalties on nitrogen or other products that are used or sold and obtained from Class members' wells.

## FRAUDULENT CONCEALMENT, LACK OF DISCOVERY, ESTOPPEL AND CONTINUOUS CONDUCT

43.   Plaintiff and the Class incorporate by this reference the allegations in paragraphs 1- 42.

44.   Throughout the class period, Defendant undertook to represent to Plaintiff and Class members on a monthly basis on their check stubs that a proper accounting had been made, but through a series of common omissions and misrepresentations, in fact Plaintiff and the Class did not receive a proper accounting.

45.   Defendant also carried out its internal practices without disclosing that Defendant was underpaying Plaintiff and the Class by an amount less than the full and appropriate royalty owner payments.

46.   Throughout the class period, the only accounting provided by Defendant to royalty owners on a monthly basis is contained in the check stubs which come to royalty owners in Oklahoma wells using the same check stub format and the same check stub software that, unbeknownst to royalty owners, fails to disclose and affirmatively misrepresents the price, quantity, value, and deductions.  Defendant represents a price which is lower than the price it receives from third party arm's-length sales because Defendant permits deductions from royalty based on marketing contracts which royalty owners do not know about and do not participate in making.  These deductions go both to price and to volume.  Consequently, when the Defendant's check stub reflects nothing in the "gross deducts" column, that is false.  Likewise, when it represents a gross quantity, that is not the measured wellhead volume but something less.   And, the "price" is not a real price.  Instead, the "price" is a calculated number that secretly reflects deductions or reductions.  And, further, the "price" does not disclose that Defendant is not

16

putting NGLs, Condensate, and/or Helium into marketable condition but is often giving those away as part of a gathering or processing contract or taking or allowing undisclosed deductions in those cases where it does pay something for constituents of the gas stream other than residue gas. Consequently, the gross value is also incorrect and low. In short, the check stub fraudulently conceals the actual volume, price, and deductions taken from royalty owners Further, the "volume" on the check stubs fail to disclose that Defendant has failed to put all components of the gas stream into marketable condition at its sole cost, but, instead, that volumetric deductions or reductions are allowed to reduce royalty amounts and that components of the gas stream are reduced as a result of fuel, and lost and unaccounted for gas (FL&U) as well as plant fuel or percentage of products paid for which result in underpayment without disclosure to royalty owners as to what is deducted or how much.

47.   Because of Defendant's misrepresentations, omissions, and/or general scheme to conceal its underpayments, Plaintiff and the Class did not become aware, and could not have become aware through the exercise of reasonable diligence, that such schemes were in existence. Therefore, Plaintiff and the Class are entitled to toll the applicable statutes of limitations, based upon the doctrines of fraudulent concealment (Plaintiff also alleges actual fraud, deceit, and constructive fraud which also tolls the statute of limitations), discovery rule, continuing conduct, and estoppel. Additionally, since the payment of royalties to royalty owners are open accounts, limitations does not run at all until the final payment on such account has been made, i.e. after the well has ceased production and a final payment has been made.

## COUNT I—BREACH OF LEASE

51.   Plaintiff and the Class incorporate by this reference the allegations in paragraphs 1- 50.

52.     Plaintiff and the Class entered into written, fully executed, oil and gas leases with Defendant, and those leases include implied covenants requiring Defendant to place the gas and its constituent parts in "Marketable Condition" at Defendant's exclusive cost. The leases also place upon Defendant the obligation to properly account for and pay royalty interests to royalty owners under the mutual benefit rule.

53.     At all material times, Plaintiff and the Class have performed their terms and obligations under the leases.

54.     Defendant breached the implied covenant of the leases by its actions and/or inactions.

55.     As a result of Defendant's breaches, Plaintiff and the Class have been damaged through underpayment of the actual amounts due.

## COUNT II—UNJUST ENRICHMENT

56.     Plaintiff and the Class incorporate by this reference the allegations in paragraphs 1-55.

57.     Defendant received the benefit of or retained monies due and owing to Plaintiff and the Class. Defendant was thereby able to use for its own purpose monies that in equity and good conscious, and as a matter of law, belonged to royalty owners.

58.     The existence and ongoing retention of these monies by Defendant affected an immediate and measurable increase in Defendant's cash, revenue, and profits.

59.     Defendant's retention of such monies is unjust and unwarranted for all of the reasons set forth herein and damaged Plaintiff and the Class. Additionally, Defendant is liable for the profits it made from the unlawful and improper retention and use of monies that should have been paid to Plaintiff and the Class.

## COUNT III—ACCOUNTING

60.     Plaintiff and the Class incorporate by this reference the allegations in paragraphs 1- 59.

61.     Plaintiff and the Class seek an equitable accounting of such monies and a disgorgement of such monies, including recovery for monies wrongfully retained at the highest interest rate allowed by equity whether that be at Defendant's internal rate of return or some other rate under applicable case law or equitable principles.

## COUNTS IV, V, AND VI.—FRAUD, DECEIT, AND CONSTRUCTIVE FRAUD

60.     Plaintiff and the Class incorporate by this reference the allegations in paragraphs 1-61.

61.     The majority of royalty owners in the class are from Oklahoma. So the uniform misrepresentations and/or omissions on the monthly check stubs were made primarily in Oklahoma and acted upon primarily in Oklahoma. .

62.  The wells involved in this case are entirely within the State of Oklahoma, and many of those wells involve unitization for secondary recovery and/or drilling and spacing units pursuant to Oklahoma law.

63.  Defendant's uniform misrepresentations and/or omissions on the check stubs all pertained to Oklahoma wells.

64.  Defendant did business associated with production of the oil and gas in Oklahoma.

65.  The oil and gas products were produced exclusively from Oklahoma wells, from Oklahoma's energy reservoirs, and primarily gathered in and processed in Oklahoma.

66.  The class members received standardized written misrepresentations and/or omissions as set forth above.

67.  More Oklahoma citizens in the Class relied on the monthly check stubs that contained misrepresentations and/or omissions than in any other state.

68.  The source of the underpayments and deductions are gas marketing contracts (sale, gathering, or processing) that pertain exclusively to gas and constituents from Oklahoma

reservoirs and are for gas conditioning services that occur almost exclusively in Oklahoma. Although the accounting for these Oklahoma gas marketing contracts is done at EOG's home office in Houston, the source of all of the numbers (and resulting misrepresentations) originate primarily from Oklahoma.

69. The monthly check stubs themselves are an attempt to comply with the Oklahoma check stub law.

70. The gas products involved in this case originate from Oklahoma wells, which both class members and Defendant were well aware and all of the gas products were pumped entirely from within the boundaries of Oklahoma. Upon their lifting from the ground, the gas and constituent products became tangible personal property collected and sold from Oklahoma reservoirs.

71. As set forth above, Defendant made a material representation that was false and/or omitted to state one or more material facts needed to make what was stated not misleading. Defendant knew when the material representations were made on the check stubs that they were false or misleading and/or at least made it recklessly without any knowledge of its truth, or made it with the intent that Plaintiffs would rely on it. Plaintiffs did rely on and/or are legally presumed to have relied upon these uniform written representations as being truthful and accurate, when they were not, and Plaintiff and the Class members suffered injury and were underpaid as a result.

72. Defendant also concealed or failed to disclose facts about the price, volume, value, various products produced, and deductions, which Defendant had a duty to disclose to avoid presenting half-truths or misrepresentations.

73. Defendant undertook the duty to properly account by making the statements in the check stubs on a monthly basis to royalty owners. By speaking on the issue, Defendant had a duty to make full and fair disclosure of all relevant facts. This is especially so because Defendant had

superior and/or specialized knowledge and/or access to information as compared to the royalty owners.

74. Defendant knew that its representations or omissions on the monthly check stubs were at least ambiguous and created a false impression of the actual facts to the royalty owners.

75. Defendant knew the facts were peculiarly within the Defendant's knowledge and that the royalty owners were not in a position to discover the facts pertaining to the proper volume, values, and constituents coming from their wells. Accordingly, having spoken on the subject matter, Defendant had a duty to make full and fair disclosure of all material facts such that its statements were not misleading and did not fail to state material facts necessary to make the statements made not misleading.

76. Defendant was deceitful by suggesting, as a fact, that the volume, price, value, and other statements were as set forth on the check stubs monthly but which was not true and Defendant knew they were not true, had no reasonable grounds for believing they were true, or gave only such information as was likely to mislead for want of the communication of the non-disclosed facts.

77. The misrepresentations and omissions were intentionally made and were intended to suggest that the price was a third party commercial price without hidden deductions, the volumes were accurately measured without volumetric deductions, and that deductions would be shown on the check stub when in fact they were not.

78. Defendant has fraudulently and deceitfully misled the Class into believing that they had been paid on the full value of the production from their Oklahoma wells by falsifying and creating misleading check stubs sent to the Class.

79. Defendant acted intentionally or recklessly in disregard for the rights of Plaintiff and the Class members, on a uniform basis, by not properly paying royalty owners, by deceiving them with check stubs that were misleading, and by failing to correct Defendant's royalty payment practices after *Johnson v. Jernigan* (1970), *Wood v. TXO* (1992), *TXO v. State* (1994), *Garman v. Conoco* (CO 1994), *Sternberger v. Marathon Oil* (KS 1995), and *Mittelstaedt v. Santa Fe Minerals Inc.* (1998) such that punitive damages in the amount of actual damages awarded should be awarded under 23 O.S. §9.1(B)(2)(b) and that Defendant acted intentionally and with malice toward Plaintiff and the Class members subjecting Defendant to punitive damages in the amount of double actual damages under 23 O.S. §9.1(C)(1)(b).

80. As a direct and proximate result of Defendant's deceit and fraud, Plaintiff and the class were underpaid monthly for royalties and are entitled to recover actual and punitive damages.

81. In addition, the money wrongfully obtained by Defendant as a result of what should have been paid to Plaintiff and the Class should be held in constructive trust along with moratory interest for Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for an Order and Judgment against Defendant as follows:

a.        Certifying this action pursuant to 12 O.S § 2023 (A) and (B)(3) 23 as a class action, appoint Plaintiff as the class representative, and Plaintiff's Counsel as class counsel with reasonable notice to be given to members of the Class;

b.        Awarding Plaintiff and the Class damages from Defendant's breach of lease and unjust enrichment, including but not limited to disgorgement, interest at the highest allowable rate (such as lawful, equitable, or internal rate of return), compensatory and punitive damages;

c.   Granting Plaintiff and the Class the costs of prosecuting this action together with reasonable attorney's fees out of the recovery;

d.   Granting an accounting of underpayments, non-payments, and wrongful deductions regarding Plaintiff and the Class;

e.   Although EOG knows how much it has been deducting in whole or in part from valuable gas constituents from Oklahoma wells, Plaintiff does not have access to that information yet, so individually, Plaintiff does not know whether damages will be in excess of $75,000 or whether class-wide damages will exceed $5 million, exclusive of interest and costs; and,

e.   Granting such other relief as this Court may deem just, equitable and proper.

## JURY DEMAND

Plaintiff and the Class demand trial by jury regarding all issues that can be tried to a jury under applicable law.

## ATTORNEYS' LIEN CLAIMED.

Date: August 20, 2010.

Jon K. Parsley OBA#16289
Jon K. Parsley PLLC
112 NE 4th Street
Guymon, OK 73942
(580)-338-8764
jparsley@ptsi.net

Rex A. Sharp OBA#011990
Gunderson, Sharp & Walke, L.L.P.
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0500
(913) 901-0419 fax
rsharp@midwest-law.com